IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

LUCIANO TRUJILLO,

    Plaintiff,

v.                                                     Case No. 13-cv-1178 MCA/SCY

ROBERT ROMERO and
ZACH GARCIA, in their individual
capacities,

    Defendants.

## MEMORANDUM OPINION AND ORDER

This civil rights lawsuit involves allegations that Defendants Robert Romero and Zach Garcia, two tribal police officers, conspired with others, including George Rivera, the Governor of the Pueblo of Pojoaque, to unlawfully seize and prosecute Plaintiff Luciano Trujillo. Plaintiff has subpoenaed Officer Jim Long, a member of the Pueblo of Pojoaque Police Department, to provide information about a license plate inquiry that the police department ran on Plaintiff's vehicle the evening of the allegedly unconstitutional arrest. The Pueblo of Pojoaque and the Pueblo of Pojoaque Police Department ("the Pueblo") contend the subpoena (1) violates the stipulated stay on discovery and (2) is an impermissible suit against the Tribe, triggering sovereign immunity.[1] *See generally doc. 78*. After reviewing the Pueblo's Motion (*doc. 78*), the subsequent briefing (*docs. 85-86*), and the relevant law, the Court has determined that the Motion should be **DENIED**.

---

[1] In its Motion, the Pueblo also argues that the subpoena was not properly served (*doc. 78* at 2). However, the Pueblo does not discuss this contention in its reply brief (*doc. 86*) and this argument appears to be moot. Therefore, the Court will not address it. Neither will the Court consider the Pueblo's one-sentence argument that a protective order is necessary to prevent Plaintiff from harassing the Pueblo (*doc. 86* at 6). *See Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1169 (10th Cir. 2002) (one-sentence argument waived because not adequately briefed); *United States v. Hardman*, 297 F.3d 1116, 1131 (10th Cir. 2002) ("Arguments raised in a perfunctory manner, such as in a footnote, are waived.").

I.      **Background**

For the purposes of this Motion, the following facts are undisputed. On March 21, 2011, Plaintiff Luciano Trujillo attended the Democratic Party Ward elections to support his son, Carl Trujillo. *Doc. 82*, Ex. 9 ¶ 2. After the meeting, Plaintiff and his son decided to go to Gabriel's Restaurant, which is located between the Pueblo of Pojoaque and the Pueblo of Tesque. *Id.* ¶¶ 3-4. While at the restaurant, Plaintiff and his son encountered Jerome Lujan, one of his son's political opponents. *Id.* ¶ 4. Plaintiff left the restaurant shortly thereafter, driving his son's truck. *Id.* ¶¶ 5-7. After merging onto State Highway 285, he was stopped and eventually arrested by Defendants Robert Romero and Zach Garcia, two members of the Pojoaque Police Department who were cross-deputized with the Santa Fe County Sheriff's Department. *Id.* ¶ 8; *see also doc. 24* ¶¶ 1, 25. Defendants charged Plaintiff with, among other things, driving while intoxicated. *Doc. 24* ¶ 35.

Plaintiff contends that he was driving lawfully and that Defendants targeted him because of his political association with his son. *Id.* ¶ 38. Through the discovery process, Plaintiff has obtained the following evidence to support these claims: (1) Defendant Romero's phone records show that he spoke with Governor Rivera at 7:01 p.m., while Plaintiff was at Gabriel's; (2) according to police records, the Pojoaque Police Department ran a license plate check on Plaintiff's vehicle at 7:13 p.m., also while Plaintiff was still at Gabriel's; (3) Defendant Romero called Defendant Garcia around 7:15 p.m.; and (4) Defendants Romero and Garcia did not see Plaintiff on the road until roughly 7:25 p.m. *Doc. 85* at 4.

Given this timeline, Plaintiff believes that information about the 7:13 p.m. license plate inquiry may be critical to his case. *Doc. 85* at 5-6. Yet, Plaintiff has not been able to ascertain the purpose of the inquiry through the use of interrogatories, because Defendants deny knowledge of

2

the inquiry. *See doc.* 82, Ex. 7 at 2. Thus, Plaintiff seeks to depose Officer Jim Long, the officer whose login number was allegedly used to run the license plate inquiry. *Id.* Specifically, Plaintiff would like to ask Officer Long who requested the license plate inquiry and what was done with the results of the inquiry. *Doc. 85* at 2.

## II.     The Stipulated Stay on Discovery

On May 14, 2014, at the behest of the parties, the Court entered a stipulated order limiting discovery pending disposition of the County of Santa Fe's motion to dismiss the third-party complaint. *Doc. 52*. Under the terms of this order, discovery was stayed with certain exemptions, including an exemption for "any depositions of non-parties scheduled by any party which are limited in subject matter to the discovery requests set forth in Docs. 39, 44 and/or 45." *Id.* at 2. This language expressly permits the proposed deposition of Officer Long, a non-party,[2] who Plaintiff seeks to depose concerning the 7:13 p.m. license plate inquiry, a topic raised in Plaintiff's First Set of Interrogatories to Defendants Romero and Garcia, *see doc. 82*, Ex. 7 at 1-2, certificate of service filed as *doc. 44*.

Despite this straightforward language, the Pueblo argues that the deposition of Officer Long would violate the discovery stay because the Pueblo "is not a party to these proceedings" and is therefore "not subject to the 'discovery requests set forth in Docs. [3]9, 44 and/or 45.'" *Doc. 78* at 4. Because this reading of the stipulated order (*doc. 52*) renders the exemption for non-party depositions nonsensical, the Court finds the Pueblo's arguments unpersuasive. Similarly, it is not clear to the Court how allowing the deposition of Officer Long would "violate[] the spirit" of the stipulated order (*doc. 78* at 4), which is a compromise reached by the parties concerning the amount and nature of discovery to proceed while the Court determines

---

[2] The Pueblo argues that Officer Long is being deposed as "an official of the Pueblo." *Doc. 78* at 4. For the purposes of determining the scope of the stipulated stay on discovery, this is inconsequential. Like Officer Long, the Pueblo is also a non-party. *Id.* at 1.

3

whether the County of Santa Fe is responsible for defending or indemnifying Defendants. Not only does the plain language of the order permit non-party depositions on certain topics, the resolution of the County's role in this lawsuit would seem to have little bearing on the costs to the Pueblo of deposing one of their non-party officers. In short, the stipulated order limiting discovery does not provide a basis for blocking the proposed deposition of Officer Long.

### III.    Sovereign Immunity

The Pueblo asserts sovereign immunity and maintains that the Court must enter a protective order preventing Plaintiff from deposing Officer Long.[3] As the Pueblo points out, the doctrine of tribal sovereign immunity protects federally recognized Indian tribes, such as the Pueblo of Pojoaque, from suit absent congressional or tribal authorization. *Kiowa Tribe v. Mfg. Techs.*, 523 U.S. 751, 754 (1998) ("As a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity."); *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2030-2031 (2014) ("[W]e have time and again treated the doctrine of tribal immunity as settled law and dismissed any suit against a tribe absent congressional authorization (or a waiver).") (internal citation omitted). Thus, the question presented is whether Plaintiff's subpoena to depose Officer Long is a suit against the Pueblo. As set forth below, the Court concludes that it is not.

### A.    *Alltel Communications v. DeJordy*

To this Court's knowledge, the Eighth Circuit is the only court of appeals to have decided whether tribal sovereign immunity shields a tribal official from a subpoena issued in a civil lawsuit in which neither the tribe nor the tribal official is a party. *Alltel Communs., LLC v.*

---

[3] The Pueblo also asks the Court to enter a protective order preventing Plaintiff from seeking any other discovery from the Pueblo or its departments. The Pueblo has not made any showing that Plaintiff is likely to make such requests and the Court is not in the position to rule on whether these requests are appropriate. Thus, the Court will deny this request as premature.

*DeJordy*, 675 F.3d 1100 (8th Cir. 2012). In *Alltel,* a telecommunications company sued one of its former vice-presidents under the theory that the vice-president violated his separation agreement by helping the Oglala Sioux Tribe pursue a tribal lawsuit against the company. *Id*. at 1101-02. During discovery, the telecommunications company delivered a subpoena *duces tecum* on the Tribe and a tribal administrator, both of whom were non-parties. *Id.* at 1102. The Tribe moved to quash the subpoenas on grounds of tribal sovereign immunity. *Id*.

After acknowledging that the Tribe's right to be free from valid discovery requests was "far from clear," *id.* at 1105, the Eighth Circuit concluded that a third-party subpoena served on a tribe or a tribal official is a "suit" triggering tribal sovereign immunity, *id.* at 1102. The Eighth Circuit recognized that the results of its ruling were "unsettling" because allowing a tribal official to block an otherwise valid subpoena confers greater immunity on the tribes than that enjoyed by federal agencies. *Id.* at 1104. This is because federal agencies are subject to the Administrative Procedures Act (the "APA") and its limited procedural waiver of immunity whereas tribes are not. *Id*. at 1104 (noting the federal government does not have a "'blank check' to ignore third-party subpoenas because the agency response may be judicially reviewed" under the APA). The Eighth Circuit, however, reasoned that "even if denying [a party] the discovery it seeks . . . works some inconvenience, or even injustice, 'it is too late in the day, and certainly beyond the competence of this court, to take issue with a doctrine [as] well-established'" as tribal sovereign immunity. *Id.* at 1106 (quoting *Am. Indian Agric. Credit Consortium v. Standing Rock Sioux Tribe,* 780 F.2d 1374, 1379 (8th Cir.1985)). Critically, throughout its analysis, the Eighth Circuit did not draw any distinction between the subpoena issued against the tribal official and the subpoena issued directly against the tribe. *See generally id.*

B.     *Bonnet v. Harvest (US) Holdings, Inc.*

If a tribal official's right to be free from a third-party civil subpoena was "far from clear" in 2012 when *Alltel* was published, the Tenth Circuit's recent decision in *Bonnet v. Harvest (US) Holdings, Inc.*, 741 F.3d 1155 (10th Cir. 2014) has muddied the waters even further. Like *Alltell*, *Bonnet* involved a sovereign immunity challenge to a third-party subpoena *duces tecum* served on a tribe in connection with a contracts lawsuit. In *Bonnet*, the plaintiff, Robert Bonnet, was a petroleum landman who had contracted with the Energy and Minerals Department of the Ute Indian Tribe to serve as an independent contractor and consultant. *Id*. at 1156. When the Tribe terminated this contract, Mr. Bonnet sued various companies and individuals (but not the Tribe), alleging that they caused the Tribe to terminate his contract prematurely. *Id*. In connection with this lawsuit, Mr. Bonnet served a subpoena *duces tecum* on the Tribe, a non-party, requesting documents relevant to the lawsuit. *Id*. at 1157.

Relying at least in part on *Alltel*, the Tenth Circuit determined that the Tribe could quash Mr. Bonnet's subpoena because the subpoena was a lawsuit against the Tribe that was barred by tribal sovereign immunity. *Id.* at 1159. The Tenth Circuit justified this outcome by citing Tenth Circuit precedent to establish that the term "suit," as used in sovereign immunity jurisprudence, encompasses a variety of compulsory judicial proceedings. A subponea *duces tecum* falls squarely within this rule because a court cannot enforce a subpoena until "after judicial process is afforded." *Id.* (quoting *Becker v. Kroll*, 494 F.3d 904, 922 (10th Cir. 2007)).[4] Thus, "a subpoena *duces tecum* served directly on [a] Tribe, regardless of whether it is a party to the underlying legal action, is a 'suit' against the Tribe, triggering tribal sovereign immunity." *Id.* at 1160.

---

[4] Under the same reasoning, a subpoena that seeks to compel an individual to appear at a deposition is also a lawsuit. In other words, in the Tenth Circuit, all subpoenas are lawsuits for the purposes of the sovereign immunity analysis.

6

Despite reaching this conclusion, the Tenth Circuit acknowledged "that many reasons exist to doubt the wisdom of perpetuating tribal immunity, at least as an overarching rule." *Id.* at 1160. In particular, the Tenth Circuit echoed the Eighth Circuit's concerns regarding the effect of allowing tribes to quash subpoenas served on tribal officials: it would allow tribes to avoid discovery requests similar to those with which federal agencies must comply under the APA.[5] The plaintiff in *Alltel*, however, issued subpoenas to the tribe *and* a tribal official, whereas the plaintiff in *Bonnet* only issued a subpoena to the tribe. In light of this situation, the Tenth Circuit expressly reserved ruling on whether sovereign immunity protects tribal officials from appropriate discovery requests. Nonetheless, in dicta, the Tenth Circuit opined that the holding in *Alltell* was overly broad:

> Although we agree with the Eighth Circuit's holding as to the immunity enjoyed by the Tribe itself, we need not decide whether a tribal official is also immune from an appropriate federal discovery request. Indeed, we see no reason why an Indian tribe should be able to "shut off an appropriate judicial demand for discovery" served on a tribal official, rather than against the Tribe itself. *See Touhy*, 340 U.S. at 472, 71 S.Ct. 416 (Frankfurter, J., concurring). As such, we do not share the Eighth Circuit's apprehensions over holding that a subpoena *duces tecum* served against the Tribe itself is a "suit" triggering tribal sovereign immunity.

*Id.* at 1162. Although dicta, this language demonstrates the Tenth Circuit is hostile to the idea that tribal sovereign immunity could be invoked to quash a subpoena issued to a tribal official.

The Tenth Circuit briefly addressed the above dicta in a footnote where it stated that under *Ex parte Young,* 209 U.S. 123 (1908), "neither a state nor a tribe would appear to be immune from a discovery request served on the appropriate agency official, rather than on the agency itself." *Id.* at 1162 n. 1. In *Ex parte Young*, the Supreme Court recognized a limited exception to sovereign immunity for suits against state officials seeking to enjoin alleged

---

[5] This result has troubled other courts as well. *See*, *e.g.*, *United States v. Juvenile Male,* 431 F.Supp.2d 1012, 1017 (D. Ariz. 2006) ("It would be strange indeed if a federal subpoena were operative against the greater sovereign and its officers but not the lesser.").

ongoing violations of federal law. *Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1154-1155 (10th Cir. 2011) ("[I]n determining whether the doctrine of *Ex parte Young* applies, 'a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'") (quoting *Verizon, Inc. v. Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645 (2002)). As the Supreme Court has repeatedly emphasized, the *Ex parte Young* doctrine is aimed at securing the vindication of federal rights. To do so, *Ex parte Young* makes use of the fiction that "an official who acts [in violation of federal law] is stripped of his official or representative character." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 104-105 (1984) (internal citation omitted).

As these cases make clear, *Ex parte Young* does not provide a blanket exception to sovereign immunity for discovery requests served on state or tribal officials. In accordance with the Supreme Court's "straightforward inquiry," if a lawsuit does not seek injunctive relief for an on-going violation of federal law, which a subpoena never does, *Ex parte Young* does not directly apply. *See Verizon*, 535 U.S. at 645. The *Ex parte Young* doctrine is narrow and unsusceptible to extension beyond its already defined parameters. *See Papasan v. Allain*, 478 U.S. 265, 277 (1986) (the *Ex parte Young* doctrine has been carefully "tailored to conform as precisely as possible to those specific situations in which it is necessary to . . . hold state [or tribal] officials responsible to the supreme authority of the United States."); *see also Estate of Gonzalez v. Hickman*, 466 F. Supp. 2d 1226, 1229 (E.D. Cal. 2006) (explaining that *Ex parte Young* does not allow plaintiffs to subpoena documents from a state official when plaintiffs seek retrospective relief in the underlying lawsuit). In other words, *Ex parte Young* cannot be used to justify the enforcement of a third-party subpoena against a government official who would otherwise enjoy immunity. To the extent *Bonnet* suggests otherwise, it cannot be reconciled with

*Crowe & Dunlevy, Verizon, Papasan*, and the legion of other cases limiting the reach of *Ex parte Young*.

Given that subpoenas, which the Tenth Circuit treats as lawsuits, do not fit within the narrow parameters of the *Ex parte Young* doctrine, one explanation for the footnote in *Bonnet* is that the Tenth Circuit cited *Ex parte Young* to provide an example of a case supporting the general principle that a lawsuit against an official of a sovereign can be treated differently than a lawsuit against the sovereign itself. But because *Bonnet* did not contain an extensive analysis of *Ex parte Young*, how the Tenth Circuit would apply the principles of *Ex parte Young* to the present issue remains unclear. What is clear is that the Tenth Circuit would be reluctant to allow a tribe to invoke the doctrine of sovereign immunity to "shut off an appropriate judicial demand for discovery" served on a tribal official. *Bonnet*, 741 F.3d at 1162. It is rational to infer that this reluctance would only be heightened in a case, such as this one, where the vindication of federal rights is at stake.

C. **Application of Law to Present Case**

Plaintiff validly brings constitutional claims against two cross-deputized tribal police officers pursuant to 42 U.S.C. § 1983. *See generally doc. 24*. Tribal sovereign immunity does not bar these claims. *See Evans v. McKay*, 869 F.2d 1341, 1348 (9th Cir. 1989) (tribal officials who act in concert with state officials may be sued for damages under § 1983); *see also McKinney v. Oklahoma, Dep't of Human Services*, 925 F.2d 363, 365 (10th Cir. 1991) (citing *Evans* favorably for the proposition that plaintiff could not maintain a § 1983 lawsuit against the Director of Health Services for the Citizen Band Pottawatomie Tribe because his actions were not under the color of state law). This is because tribes, like states, cannot impart sovereign immunity to officials acting in violation of federal law. *See Tenneco Oil Co. v. Sac & Fox Tribe of Indians*,

725 F.2d 572, 574 (10th Cir. 1984) ("When the complaint alleges that the named officer defendants have acted outside the amount of authority that the sovereign is capable of bestowing, an exception to the doctrine of sovereign immunity is invoked."). A corollary of this principle is that a tribe may not always use its sovereign immunity as a tool to interfere with an otherwise lawful discovery request concerning an alleged federal constitutional violation committed by a tribal official while acting under color of state law.

The opposite rule would lead to absurd results. A plaintiff's right to pursue federal constitutional claims would be toothless without a corresponding right to acquire necessary evidence to prove these claims. For instance, suppose a state police officer, or tribal officer acting under color of state law, illegally stopped a driver, pulled him out of his car, and beat him because of his race. If the incident were captured on the officer's lapel or car camera, under the Pueblo's reasoning, the sovereign easily could prevent disclosure of the recording by having the officer turn it over to the sovereign's records custodian. The Court does not believe that Congress or the Supreme Court would allow civil rights lawsuits to be hobbled in this way.

And, the potential injustice works both ways. For example, Defendants Romero and Garcia have listed Officer Long as a potential witness for the defense. *Doc. 82*, Ex. 2. It would offend basic principles of fairness to subject Defendants Romero and Garcia to personal liability for actions they took as cross-deputized tribal officers and then allow the Tribe to prevent them from calling a tribal official who may have exculpatory information as a witness.

The federal government and the public at large has a strong interest in ensuring that individuals deprived of their constitutional rights have an available mechanism for vindication of these rights. This interest weighs against the Pueblo's assertion of sovereign immunity. As the Eighth Circuit recognized in *Alltell*, federal courts retain some discretion to interpret the doctrine

10

of sovereign immunity so as to prevent "conflict[s] with more important federal interests, such as the constitutional rights of criminal defendants." *Alltel*, 675 F.3d at 1105; *see also United States v. Velarde,* 40 F. Supp. 2d 1314, 1317 (D.N.M. 1999) ("[T]he Court's interests in seeing that federal law is enforced and that Defendant's constitutional rights are protected outweigh any residual sovereign immunity that the Tribe might enjoy").

The Court acknowledges that normally, "tribal immunity protects tribal officials against claims in their official capacity." *Fletcher v. United States*, 116 F.3d 1315, 1324 (10th Cir. 1997). For example, in *Fletcher*, the plaintiff sued individual members of a tribal council for prospective relief involving tribal voting rights. The Tenth Circuit reasoned that the tribe's sovereign immunity protected the members of the tribal council from suit because the relief requested "would run against the Tribe itself." *Id.* The facts before the Court, however, are distinct from those presented in *Fletcher* and other cases that have applied this general rule. First, the case at bar has federal constitutional implications -- the information sought from Officer Long relates to a lawsuit validly brought against officers of the Pueblo pursuant to § 1983.

Second, rather than a lawsuit filed by complaint that seeks a judgment against the sovereign, the current lawsuit simply seeks to have a tribal official who arguably worked in conjunction with tribal officers acting under color of state law provide basic information related to the stop of Plaintiff's car. Plaintiff's proposed "intrusion" on the Pueblo is minimal. Requiring Officer Long to appear for a deposition during his off-duty hours does not require the Pueblo of Pojoaque to expend resources sorting and compiling documents. Plaintiff estimates that Officer Long's deposition will take less than one hour. *Doc. 85* at 7. While this burdens Officer Long slightly, the Pueblo is under no apparent obligation to set aside work hours for the deposition.

Any costs incurred by the Pueblo as a result of "preparing and attending deposition with Officer Long" (*doc. 78* at 4) are purely voluntary.

This matters because the test to determine whether a lawsuit is against the sovereign is whether "'the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration,' or if the effect of the judgment would be 'to restrain the Government from acting, or to compel it to act.'" *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 101 n. 11 (quoting *Dugan v. Rank*, 372 U.S. 609, 620, 83 S. Ct. 999 (1963) (internal quotation marks omitted); *see also*, *Bonnet*, 741 F.3d at 1159 (the basic principle of sovereign immunity is that "courts lack jurisdiction to restrain the government from acting, or to compel it to act" in the absence of governmental consent). The subpoena issued against Officer Long does not implicate the core concerns of sovereign immunity because it does not require the sovereign to expend itself on the public treasury or domain or restrain the Pueblo from acting, or compel it to act.

Nor is this case similar to *Boron Oil Co. v. Downie*, 873 F.2d 67, 71 (4th Cir. 1989), a case where the Fourth Circuit allowed the Environmental Protection Agency ("EPA") to quash a subpoena that sought to compel one of its agents to testify in a lawsuit where the EPA was not a party. In contrast to the potential burden identified in *Boron Oil Co.*, the subpoena issued to Officer Long seeks testimony about a lawsuit filed against tribal officers in connection with actions they took while acting under color of state law; it does not seek to compel Officer Long to provide testimony in an unrelated lawsuit to which no Pueblo official is a party. Had the subpoena in *Boron Oil Co.* sought information from an EPA agent that related to a complaint that another EPA agent violated an individual's constitutional rights, the Fourth Circuit's analysis likely would have been much different. While a sovereign is not required to expend

12

resources helping private plaintiffs prove their private lawsuits, neither should it be permitted to prevent plaintiffs from obtaining discovery in validly brought lawsuits that allege constitutional wrongdoing committed by the sovereign's employees while they worked on behalf of the sovereign.[6]

It is also relevant that Plaintiff seeks to depose Officer Long about *his participation* in an illegal stop two cross-deputized tribal police officers allegedly conducted under color of state. According to Plaintiff, minutes before the March 21, 2011 stop, someone using Officer Long's identification number ran a check on Plaintiff's state license plate using a non-tribal database. While it is unclear what role this license plate check played in the stop, it is undisputed that Plaintiff was eventually charged in state court as a result of the stop. It is a reasonable inference that the license plate inquiry was associated with the stop. Insofar as Officer Long aided in this series of events leading to Defendants' stop, arrest and prosecution of Plaintiff on state charges, it is arguable that he was not acting solely as a tribal official and may therefore be deposed about his knowledge of these events. *See Evans v. McKay*, 869 F.2d 1341, 1348, 1348 n.9 (9th Cir. 1989) ("It is well established that private parties who act in concert with officers of the state are acting under the color of state law within the meaning of section 1983" and "[i]f . . . the individual tribal defendants acted in concert with the police defendants, whose actions we have here held to be under color of state law, their actions cannot be said to have been authorized by tribal law.")

---

[6] In *Boron Oil Co.*, the Fourth Circuit explained that it was reasonable for the EPA to avoid a subpoena compelling one agent to testify in a third-party lawsuit, because a rule allowing third-party litigants to routinely compel EPA agents to provide testimony related to information acquired in the course of their official duties would greatly burden the EPA. *Id.* at 71. The Fourth Circuit also partly based its decision on the *Supremacy Clause*, which is not a consideration in the present case. *Id.* ("Such action plainly violates both the spirit and the letter of the *Supremacy Clause*.").

### D. Conclusion

The Court limits its ruling in this case in recognition that a subpoena to a tribal official could expend itself on the public treasury or domain; or interfere with the public administration; or restrain the Tribe from acting, or to compel it to act in a case where no federal interest was at stake. In such a case tribal sovereign immunity might be invoked to quash the subpoena. Ruling otherwise would eviscerate the doctrine of tribal sovereign immunity by allowing a party to obtain information it could not obtain directly from the tribe by simply issuing a subpoena to a tribal official. In this case, however, the Pueblo has determined that it is in their best interests to cross-deputize their police officers. Having made that choice, the Pueblo should not be permitted to effectively immunize its police officers from civil liability by invoking sovereign immunity to prevent a tribal official witness who arguably took part in the activity performed under color of state law from testifying.

**IT IS THEREFORE ORDERED THAT:**

1. The Pueblo's Motion for a Protective Order (*doc. 78*) is **DENIED.**
2. Plaintiff may depose Officer Long concerning his knowledge of the March 21, 2011, 7:13 p.m. license plate inquiry run by the Pojoaque Police Department. Plaintiff must confer with Officer Long to find a mutually convenient time for the deposition, which is to last no more than one hour.

_____
STEVEN C. YARBROUGH
UNITED STATES MAGISTRATE JUDGE